IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Ansel E. Boggs, Jr., ) | |
| ) | Civil Action No. 6:04-22456-HFF-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Fuji Photo Film, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment. In his complaint, the plaintiff alleges that defendant Fuji Photo Film, Inc. ("Fuji"), his former employer, retaliated against him for having previously filed a charge of age discrimination against the company. He also alleges state law claims for breach of contract and breach of contract accompanied by a fraudulent act.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

Fuji manufactures a variety of imaging and information products at its Greenwood, South Carolina, manufacturing campus. Fuji hired the plaintiff on February 5, 1996, as a maintenance technician at its "N" plant (pl. dep. 40, 48-50). During his entire Fuji employment, the plaintiff worked as a maintenance technician in the "N" plant (pl. dep. 48). During the relevant time period, Bill West served as Fuji's Vice-President of Human Resources and Administration and previously (until June of 2001) was responsible for Operations, Environmental Health, and Safety (West aff.). Mr. West served as one of Fuji's Vice-Presidents

since September 1991 until his retirement on June 30, 2003 (West aff.). During the relevant time period, Mr. West directly supervised Matt Bulman, who was then the Human Resources Manager at the "N" Plant (West aff.; White aff.). During the relevant time period, Craig White served as the Company's Vice-President of Corporate Communications and Legal/Government Affairs, and, prior to 1997, he served as Vice-President of Human Resources and Administration (West aff; White aff.). Fuji hired Carol Edwards on September 22, 2003, to head its Human Resources department, and Ms. Edwards has been the Chief Human Resources executive at Fuji since her date of hire (Edwards aff.).

During the plaintiff's initial employment orientation, Fuji provided him with a document entitled *Fuji Highlights* ("*Highlights*"), which Fuji published and distributed to its employees and which contained provisions governing the mutual responsibilities of Fuji and its employees (pl. dep. 52, 94; pl. opp., ex. G, *Fuji Highlights* 2ed. (1993)). In the portion entitled "Confidentiality," *Highlights* stated:

> Fuji Film operates in highly competitive markets. Our operations and much of the information you will learn here as part of your job are confidential. Maintaining this confidentiality is critical to the future of our Company and each of our jobs. Each of us has the responsibility not to disclose confidential information to anyone outside the Company, either intentionally or inadvertently. Fuji has a well-defined policy concerning confidential information which will be fully explained to you. It is essential that you abide by it.

*Highlights* at 25.

Contemporaneously, the plaintiff was required to sign an Associate Confidentiality Agreement and Assignment of Inventions ("confidentiality agreement") which stated in pertinent part:

> I shall not, without the prior written consent of Fuji Film, disclose to any person other than authorized Fuji Film representatives, or use for my own or any other person's benefit, any Confidential Information acquired or developed by me during my employment Fuji Film.

2

(Bulman dep., ex. 1). The confidentiality agreement defined "Confidential Information" to mean:

> information, not generally known, and proprietary to Fuji Film, including any trade secrets, know-how, or other technical or non-technical data relating to Fuji Film's formulas, processes, methods of manufacture, customer lists, identities of suppliers and supplier relationships, cost and costing methods, pricing techniques and strategies, sales agreements with customers, profits and product line profitability information, present and future marketing strategies, and any other information which is not publicly available, which has independent economic value and is subject to efforts reasonable under the circumstances to maintain its secrecy.

(Bulman dep., ex. 1).

*Highlights* also contained an Equal Employment Opportunity policy (*Highlights* at 10). The policy stated:

> Fuji … will not discriminate against any Associate or applicant for employment because of race, color, religion, sex, national origin, age disability, or against disabled veterans or Vietnam Era Veterans.
>
> Fuji will always act to ensure that applicants and Associates are treated with respect and dignity. Such action will include, but not be limited to: employment; promotion; demotion; transfer; … layoff or termination; rates of pay or other forms of compensation; and selection for training.

(*Highlights* at 10).

Some years after the plaintiff started his employment, Fuji began to make its policies available to employees on the intranet (pl. dep. 53-56). One of these policies was entitled "Workplace Guidelines"; this policy outlined conduct Fuji deemed unacceptable and established the consequences to be imposed in the event an employee engaged in such behavior (Bulman dep., ex. 1). Misconduct characterized as a "Class I violation" called for counseling with progressive discipline for further infractions – proceeding through verbal warning, written warning, final written warning, termination (Bulman dep. 36-40, 59-60, 62, ex. 1). Misconduct amounting to a Class II violation authorized Fuji to terminate employment without reference to the progressive discipline policy (Bulman dep., ex. 1). The Workplace Guideline

listed, among others, "[d]isclosure of confidential information," "[f]alsifying Company records or providing false information to the Company and/or its Associates," and "[h]arassment" as conduct Fuji considered to be a Class II violation (Bulman dep., ex. 1).

During his employment with Fuji, the plaintiff became concerned about the fairness of the wages and training he received from Fuji as compared with younger maintenance technicians in the "N" Plant (pl. dep. 64). After failing to obtain satisfaction when he raised his concerns about pay and training with Fuji management, the plaintiff filed a charge of age discrimination against Fuji with the Equal Employment Opportunity Commission ("EEOC") dated July 11, 2002 (the "2002 Charge") (pl. dep., ex. 13). The plaintiff's 2002 Charge alleged that Fuji had discriminated against him because of his age with respect to pay and training. Mr. Bulman responded to the 2002 Charge on August 12, 2002, denying Fuji had discriminated against the plaintiff on account of his age (Bulman dep. 68, 79, ex. 1). Mr. Bulman did not designate, or otherwise identify, as confidential any of the material he submitted on behalf of Fuji in response to the plaintiff's charge; accordingly, the material submitted became subject to disclosure under the Freedom of Information Act ("FOIA") (Bulman dep. 84-93; pl. dep. 65). In particular, Mr. Bulman submitted a document containing a chart listing the respective names, salaries, performance evaluations, and ages of each of the maintenance technicians employed in Fuji's "N" Plant (the "FOIA Document") (pl. resp., ex. H). After obtaining a Notice of Right to Sue from the EEOC in 2002, the plaintiff submitted a FOIA request through counsel and obtained the materials Fuji had submitted in opposing the 2002 Charge. The FOIA Document was among those produced. The plaintiff declined to pursue litigation against Fuji (pl. dep. 82, 114, ex. 11). Soon thereafter, the plaintiff shared information set forth in the FOIA Document with, and showed the FOIA Document to, a number of "N" Plant maintenance technicians (pl. dep. 70-75). The plaintiff admitted that he showed and/or shared the information with other associates, including Clayton Ellisor, Kevin Busbee, Curtis Wright, Keith Wilborn, and Rich Baggett (pl. dep. 73-76).

During the plaintiff's discussions with members of management regarding Fuji's compensation practices, members of management would discuss the plaintiff's salary/compensation, but would never reveal to him information about other associates' salary/compensation (pl. dep. 68). The plaintiff admitted that at the time he received his pay, it would come in a sealed envelope so that others could not see what he was being paid (pl. dep. 60-61). In his deposition, Mr. Bulman described the confidential nature in which Fuji viewed salary information:

> [T]he salary information really wasn't provided when I was in HR … I only had access to the salary … in the facilities that I was responsible for … I didn't have access to anybody else's salaries. All the personnel files were located in one department. For us to even access those, we had to get a key from a person in HR that maintained all the keys. The personnel files were kept in confidence. The salaries were kept confidential. And when we posted jobs, we would post the salary range only. But when people were given the application, or given a copy of the job posting, that information would be omitted.

(Bulman dep. 159-60; West aff.; White aff.; Edwards aff.)

On February 13, 2003, Fuji Management received a report about the plaintiff disclosing salary and performance information about other Fuji associates (West aff.; pl. dep. 73-76; Bulman dep. 71, ex. 11). Mr. Bulman immediately began investigating the allegations (West aff.; Boggs dep. 78-80; Bulman dep. 71-72, 159-60). On February 13, 2003, Mr. Bulman met with the plaintiff to discuss his knowledge regarding the disclosure of confidential information (West aff.; pl. dep. 78-80; Bulman dep. 76, ex. 11). Mr. Bulman's investigative notes reflect that the plaintiff initially denied sharing the information with his fellow associates (Bulman dep. 77, ex. 4, 5, 6). Based on the information he secured in his investigation, including signed statements from several associates, Mr. Bulman recommended to senior management that the plaintiff's employment be terminated (Bulman dep. 71-72, 127-28, 151, 166, ex. 12). Mr. West and Mr. White agreed with the recommendation and conclusions supporting termination, and Mr. West approved the termination recommendation (West aff.;

5

White aff.; Bulman dep.71-72, 74, 94-95). Fuji terminated the plaintiff's employment on February 19, 2003 (pl. dep. 81; West aff.; White aff.; Bulman dep. 15, 101, 151,155-58, 166, ex. 1, 3, 5).

## **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to

6

withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### *Retaliation*

The Age Discrimination in Employment Act ("ADEA") makes it an unlawful employment practice to discriminate against an employee "because such individual . . . has opposed any practice made unlawful [under the ADEA], or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. §623(d). To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse action." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc). If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer

7

to articulate a legitimate nondiscriminatory reason for its actions. If the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Id.*

The plaintiff clearly can establish the first two elements of a *prima facie* case of retaliation. He argues that the third element, a causal link between the EEOC charge and his termination from employment, can be shown by the temporal proximity between the two (pl. opp. 8). The charge was filed on July 11, 2002, and the defendant knew about the charge at least by August 12, 2002, the date it submitted a position statement denying the charge. The plaintiff was terminated from employment on February 19, 2003. Accordingly, at least six months passed between the two events.

In *Dowe v. Total Action Against Poverty,* 145 F.3d 653, 657 (4th Cir. 1998), the Fourth Circuit Court of Appeals noted that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." In *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), which is a Title VII case, the United States Supreme Court noted:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Id.* at 273-74.

Here, the delay of at least six months between the protected activity and the plaintiff's termination weakens significantly the inference of causation. However, as it is a close question, the court will assume for purposes of this motion that the plaintiff can establish a *prima*

8

*facie* case of retaliation, although not a very strong one. *See generally Price v. Thompson,* 380 F.3d 209, 213-15 (4th Cir. 2004).

Assuming that the plaintiff can establish a *prima facie case*, the defendant has articulated a legitimate nondiscriminatory reason for the plaintiff's termination from employment – that the plaintiff disclosed confidential information. Accordingly, the burden shifts to the plaintiff to show pretext. The plaintiff argues that pretext can be shown in that the defendant treated other similarly situated persons more favorably than the plaintiff, in that the defendant offered differing and inconsistent reasons for the plaintiff's termination, in that the defendant's interpretation of its own policies is in conflict with the language of the documents, and in that the defendant's interpretation of its policies violates federal law.

The plaintiff first alleges that the defendant treated other employees who disclosed salary and performance information of other associates more favorably than it did the plaintiff. However, the plaintiff's argument fails. The evidence cited by the plaintiff involved discussions among the associates about their own salary information (*see* Busbee dep. 11-14 (testifying that maintenance technicians infrequently but openly discussed their salary information and pay increases); McBride dep. 16-19 (testifying that maintenance technicians discussed their reviews after they had them every year); pl. dep. 59, 75, 158-59 (testifying that maintenance technicians discussed their pay all the time); Wright dep. 19-21 (testifying that maintenance technicians on several occasions talked about their salaries).
The plaintiff has brought forward no evidence than any associate either showed and/or discussed salary and performance information not their own with any other person. The plaintiff stated in his own deposition that in his discussions with members of management regarding Fuji's compensation practices, members of management would discuss the plaintiff's compensation, but would never reveal to him information about other associates' compensation (pl. dep. 68).

> The plaintiff next argues:
>
> Bulman allowed the identical information in the FOIA document [the plaintiff] shared to be disclosed to the general public. Bulman admitted that he failed to ensure that confidentiality was asserted as to the salary information submitted to prevent its production pursuant to a request under the Freedom of Information Act. He responded to the 2002 Charge without stamping the attached documents as "Confidential." It is undisputed that Fuji considered the salary information confidential with respect to those outside the Fuji "family," and Bulman's conduct resulted in that information entering the public domain.

(Pl. opp. 13).

It is the perception of the decisionmaker, not the employee, which is relevant to the question of unlawful discrimination. *See, e.g., Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998). Here, it is undisputed that Fuji perceived the information regarding employee salaries and performance appraisals as confidential, and the plaintiff was certainly on notice of the sensitive nature of this information (Bulman dep. 159-60; West aff.; White aff.; Edwards aff.). The fact that Mr. Bulman provided this information to the EEOC in response to the plaintiff's charge of discrimination did not change the nature of this information and did not amount to "public disclosure" as alleged by the plaintiff. Further, as argued by the defendant, any reasonable person would consider the personal information[1] included on the chart as confidential. The fact that the company inadvertently did not stamp "confidential" on the document did not alter the nature of the information. In an analogous situation described by the defendant, if the company distributed W-2s to its employees, and one employee left his W-2 on the floor, although the company did not designate the form as confidential, there would be no doubt that the information contained therein was confidential. Another employee could not feel free to publish the information contained in the W-2 to other co-workers under the claim that the company did not designate it as confidential (def. m.s.j. 23). Based upon the foregoing, Mr. Bulman's disclosure of the form in the course of an EEOC investigation clearly was not

---

[1] The personal information included names and ages of Fuji employees, their hourly pay rates, their performance evaluation ratings over the past five years, and their percentage increases in salary from year to year.

10

substantially similar conduct to that of the plaintiff in disclosing the confidential information to his co-workers.

The plaintiff next argues that the defendant's "differing reasons offered for [the plaintiff's] termination" are evidence of pretext (pl. opp. 13). Specifically, the plaintiff claims that an "inconsistent reason" was given in response to the plaintiff's EEOC charge of retaliation, when Fuji stated that it terminated the plaintiff for disclosing confidential information *and* for lying to Mr. Bulman during the investigation into the matter (pl. opp. 14). A memorandum to the plaintiff's personnel file by Mr. Bulman, which is dated February 19, 2003, states that the plaintiff was terminated for falsifying information in the investigation in addition to disclosing confidential information (pl. opp. 15; Bulman dep., ex. 5). The memorandum goes on to state that the plaintiff showed at least three other associates a list of salaries that he had received from his attorney, and when questioned, the plaintiff denied showing the list, although three co-workers signed statements that he had done so (Bulman dep., ex. 5). The plaintiff argues that "these three different statements by Fuji in explanation of its reason for [the plaintiff's] termination permit a reasonable factfinder to conclude that Fuji's proffered legitimate nondiscriminatory reason for [the plaintiff's] termination is not worthy of credence" (pl. opp. 15).

This court disagrees. The defendant has remained consistent in its reason for the plaintiff's termination. During the EEOC charge investigation phase and the hearing before the South Carolina Employment Security Commission, as well as in this litigation, the defendant articulated its reason for termination as the disclosure of confidential salary and employment information (Bulman dep., ex. 1, 3, 5, 11). The plaintiff himself testified that the defendant told him the reason for his termination from employment was for divulging the confidential information (pl. dep. 81). As argued by Fuji, all contemporaneously-prepared documents reflect that the defendant terminated the plaintiff for disclosure of confidential information. The fact that Mr. Bulman also noted that the plaintiff had provided false information during Fuji's investigation into the matter and that this was a secondary violation of policy does not create an inference of

11

pretext. The plaintiff's argument that the defendant has given "inconsistent reasons" for the plaintiff's termination is not supported by the evidence.

The plaintiff next argues that the defendant's interpretation of its own policies is in conflict with the language of the documents. Specifically, the plaintiff argues that neither the confidentiality agreement nor the discussion of confidentiality in *Highlights* purports to regulate Fuji employees in their relationships with other Fuji employees. The plaintiff argues that these documents are directed at preventing disclosure of Fuji's proprietary information in the marketplace where competitors could take advantage of it (pl. opp. 15-17). The plaintiff states:

> Disclosing salary information among Fuji employees, while discouraging its dissemination outside Fuji is consistent both with the language and purpose of the Confidentiality Agreement and *Highlights* Confidentiality and Communication policies. Bulman Exhibit 1 at Defendant 0433-34, *Highlights* at 25. A reasonable factfinder could conclude that it is more likely that Fuji actually construed its Workplace Guideline on disclosure of confidential information in a manner that was consistent with its own past treatment of the same information and that the contrary construction fo the Workplace Guideline with respect to Boggs was a pretext for retaliation.

(Pl. opp. 17).

However, the uncontradicted evidence in this case is that the defendant considered salary information to be confidential (Bulman dep. 141-42, 146, 159-60; White aff.; West aff.), and that Fuji was consistent in its practice of not revealing information about other associates' salaries/compensation to the plaintiff or any other employees (pl. dep. 66-68). The confidentiality agreement signed by the plaintiff defined "confidential information" as "any other information which is not publicly available, which has independent economic value and is subject to efforts reasonable under the circumstances to maintain its secrecy" (Bulman dep., ex. 1). The plaintiff has failed to show that the defendant treated such information as anything other than confidential and has further failed to show that the defendant's construction of its policies is inconsistent with the language of the documents.

Lastly, the plaintiff argues that the defendant's treatment of wage information as confidential violates federal law. The plaintiff states that the defendant's interpretation of its policies as prohibiting

> employees from, or penaliz[ing] them for, discussing salary information would constitute an unfair labor practice [under] Section 8(a) of the National Labor Relations Act prohibiting employers from interfering with its employees exercise of certain protected rights. . . . A reasonable factfinder could conclude that it is more like that Fuji actually understood its Workplace Guideline to apply in a manner consistent with federal law.

(Pl. opp. 18).

The plaintiff cites *NLRB v. Main Street Terrace Care Center*, 218 F.3d 531 (6th Cir. 2000), for the proposition that Fuji enforced its Workplace Guidelines in violation of the National Labor Relations Act. The National Labor Relations Act ("NLRA") provides to employees the right to self-organize and bargain collectively over wages, hours, and other working terms and conditions of employment. The pertinent employee rights are set forth in Section 7 of the Act; an employer's violation of these Section 7 rights creates "unfair labor practices" under Section 8(a) of the Act. 29 U.S.C. §§157 & 158(a). Importantly, the United States Supreme Court has held that "it is only when the interference with §7 rights outweighs the business justification for the employer's action that §8(a)(1) is violated." *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965). The defendant has articulated its business justification for treating salary information as confidential, stating that the information has important economic value to the company as competitors could use the information to lure associates from the company. Further, the salary information has independent economic value "as imbedded in most every salary was the cost of job training, skill training, and product knowledge" (White aff. ¶ 10).

The evidence shows that the defendant treated information about other associates' compensation as confidential, and the plaintiff had notice of this fact. Nonetheless, the plaintiff shared the information that he had obtained through his EEOC charge with his co-

13

workers, which violated the confidentiality agreement he had signed. The plaintiff has failed to show that the defendant's termination of the plaintiff's employment on this basis was pretext for retaliation.

*State Law Claims*

The court should decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims as it is recommended that summary judgment be granted on the federal claim. *See* 28 U.S.C. §1367(c).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment be granted on the plaintiff's ADEA claim and that the court decline to exercise supplemental jurisdiction over the state law claims.

                                s/William M. Catoe
                                United States Magistrate Judge

November 13, 2006

Greenville, South Carolina

14